UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X

UNITED STATES OF AMERICA            :

      -v-                                      :            14 CR 741 (KMK)

MARTIN KOFMAN                             :

                                                      :
                Defendant.
------------------------------------------------------X

# MEMORANDUM IN AID OF SENTENCING
# ON BEHALF OF MARTIN KOFMAN

SERCARZ AND RIOPELLE, LLP
810 Seventh Avenue, Suite 620
New York, New York 10019
Telephone: (212) 586-4900
*Attorneys for Martin Kofman*

## INTRODUCTION

We submit this Memorandum in aid of sentencing in order to demonstrate that a sentence involving a term of probation, as set forth herein is "sufficient, but not greater than necessary" to comply with the purposes of 18 U.S.C. §3553(a)(2).

## THE HISTORY AND CHARACTERISTICS OF THE DEFENDANT
### (18 U.S.C. § 3553(a)(1))

### Kofman's Education and Legal Career

Mr. Kofman is a 56 year old man who has never previously been charged with, or convicted of, a crime. His life has been marked by hard work, devotion to his family and a significant degree of community involvement.

Kofman was born on May 2, 1961 to an Orthodox Jewish family in Brooklyn, New York.

Consistent with Kofman's orthodox upbringing, he was educated in various Yeshivas throughout his grade school and high school years. Thereafter, Kofman pursued rabbinical studies at the Yeshiva while attending Touro College at night. Kofman earned an accounting degree from Touro College in 1982.

Thereafter, Kofman continued his rabbinical studies by day while attending law school at night. In addition, Kofman worked part-time in the accounting firm of Irwin Kaufman, CPA. Kofman obtained his law degree in 1986.

After law school, Kofman worked for a brief period for the accounting firm now known as Ernst & Young.

In May 1987, he began his legal career. Kofman sought and obtained work for firms with a real estate practice. Both his father and grandfather had careers in real estate.

In 1993, the Lowenthal & Kofman firm was formed. Mr. Lowenthal engages in corporate work and litigation. Kofman did real estate closings and real estate finance work, until he resigned from the firm on the day before he entered his guilty plea.

It is significant that throughout his legal career, Mr. Kofman has never been the subject of any attorney disciplinary proceedings.

## THE NATURE AND CIRCUMSTANCES OF THE OFFENSE
(18 U.S.C. § 3553(a)(1))

### Kofman's Relationship To The Rubin Family

Members of the Rubin family were among Mr. Kofman's first clients when he opened the firm. The Rubins brought with them a portfolio of commercial real estate consisting of multiple family dwellings. Later, the Rubins became involved in the construction of condominiums. Members of the Rubin family also hired Kofman to do their residential real estate closings.

Kofman estimates that he has done approximately 200 real estate closings on behalf of members of the Rubin family. In addition, there were approximately 30 instances in which the Rubins came to Kofman to locate private financing for Rubin real estate deals. In each instance, Kofman found an appropriate lender and then represented the lender at the closing after securing a waiver of any conflict of interest.

### The Charges Contained In the Indictment

Kofman is charged in Count One of the Indictment with Conspiracy to Commit Bank Fraud and Wire Fraud. Kofman is also charged in Count Two of the Indictment with Conspiracy to Make False Statements to Lenders.

Count Two of the Indictment alleges, in pertinent part, that:

¶ 15. On or about June 4, 2009, Martin Kofman, the defendant, submitted a letter in connection with a loan on a property at 9720 Kings Highway,

2

Brooklyn, New York stating that his firm was currently holding the sum of $2 million in escrow.

On or about March 31, 2008, Messrs. Samuel Rubin ("Samuel") and a non-defendant brother, Lipa, purchased the above-referenced premises from the owner, Mr. Yehudah Nelkenbaum, for the sum of $11,025,000. This purchase was funded by some cash, by assumption of the existing mortgage in default and foreclosure in the approximate amount of $9.5 million, and with a purchase money loan in the amount of $400,000.

Towards the middle of June 2009, Samuel sought to restructure the indebtedness and to transfer ownership of the property to a new entity. The transaction was couched as a purchase for tax and liability purposes, rather than a refinance for which Samuel would also have qualified.

Kofman represented Samuel in connection with this transaction. Given the total cost of the property, the lender required that Rubin make a $2 million equity investment into the property and supply proof that the funds were available prior to the closing. At the time Kofman made the representation referred to above, the funds were, indeed, in the account. Moreover, Kofman knew that Rubin was able to meet all of the financial requirements necessary to purchase the property, since Samuel had already owned the property for a year, and had negotiated more favorable terms for the repayment of the loan. The loan was paid off in full, well before this case was initiated.

Finally, Kofman gained nothing from his involvement in this transaction, beyond the receipt of his customary legal fee.

**The Presentence Report**

Paragraph 84 of the Presentence Report ("PSR") accurately reflects that Kofman has resigned from the law firm of Lowenthal & Kofman.

Paragraphs 89 through 91 of the PSR endeavor to summarize the defendant's net worth and financial condition. These paragraphs reference our objections to the PSR. In view of the nature of the crimes charged in the Indictment and the defendant's relationship with his co-defendants, we wish to make two additional points:

First, when the defendant first entered the private practice of law, he was advised by colleagues not to place his family residence into his own name. The decision to follow this advice had nothing to do with the kind of behavior that is the subject of the charges against his co-defendants.

Second, with regard to the defendant's residence, even if the Court determines to include the value of the home in calculating the defendant's net worth, it should be noted that his wife is listed as the owner of the home. While the PSR credits Mr. Kofman with the entire net worth of the home, at least 50 percent of the net worth of the home is hers.

Finally, the Court will note that, according to Paragraph 91 of the PSR, the defendant is currently carrying approximately $87,000 of credit card indebtedness. This is due, primarily, to the defendant's recent expenses in connection ███████████████████████████

███████████████████████

We respectfully submit that while the Probation Department has determined that the defendant "has the ability" to pay a fine, given the fact that the defendant is no longer engaged in the practice of law and has yet to embark on other projects for earning income, the imposition of a fine would not be appropriate in accordance with the sentencing factors outlined in 18 U.S.C. § 3553(a).

# THE 18 U.S.C. § 3553(a)(2) FACTORS

## Kofman's Family Circumstances

Kofman married Simy Wiederman in 1984. The couple raised 5 children; four of whom have married. They now have 13 grandchildren.

The youngest of Kofman's children, Rochelle, was involved in seminary studies and has completed two years of work toward her bachelor's degree. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Rochelle is extremely close to her father. ▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

## Community Involvement

Martin Kofman is a devoted member of his synagogue. He has led services on the High Holy Days for the past 25 years – a signal honor within his community.

Mr. Kofman is also involved in an international charity called "Chai Lifeline." The organization assists the families of children – as well as the children themselves – afflicted with cancer and other incurable debilitating illnesses. The organization runs a camp for eight weeks during the summer in order to provide some welcome relief for the children and an equally welcome respite for their parents. He is part of a small group of individuals that has raised in excess of $30 million on behalf of the organization over the last six years.

Moreover, Kofman is a founding member of, and has remained active in, "Always Our Kids." This organization provides life-saving assistance for young people ages 13 through 30. It is located in a clubhouse on Avenue M and Utica Avenue in Brooklyn which was established in 2004. The property was substantially paid for by Mr. Kofman. It offers a place for young people

5

to congregate where there is food for the hungry and activities for young people who might otherwise run afoul of the law, and who just need someone to talk to at any hour of the day or night. Kofman's involvement is particularly meaningful given the problems that his daughter currently faces.

**The Consequences Of A Conviction**

On the day before Kofman entered his guilty plea, he resigned as a member of his firm. Kofman walked away from a substantial law practice. I am informed that, in light of his conviction for a felony, he will inevitably lose his license to practice law. While he has opportunities to earn money in the real estate business, his prospects are uncertain.

The emotional toll of Kofman's Indictment, ███████████████████, on Mrs. Kofman has been enormous. Indeed, according to Martin, she would be a good candidate for anti-depressant, or anti-anxiety, medication but for her fear of becoming addicted to using prescription drugs.

███████████████████████████████████████████████

███████████████████████████

Kofman's parents presently reside in Brooklyn. Kofman's father has recently undergone valve replacement heart surgery, and suffers from a progressive and debilitating blood disease. His mother recently broke her hip and also suffers from the possible initial onset of dementia/Alzheimer's. Kofman's parents are, likewise, quite reliant upon their son.

**Letters Of Support**

Annexed hereto are over 80 letters submitted on Mr. Kofman's behalf. We have also annexed a thumb drive which contains a series of character references. For ease of reference, they have been divided into several categories including (A) Kofman's immediate family; (B) letters from siblings, children and in-laws; (C) letters from members of the extended family; (D)

letters from members and employees of Lowenthal & Kofman; (E) letters from kids at risk; (F) letters regarding his charitable work; (G) letters from those in the legal community; and (H) letters from friends. Many of Mr. Kofman's close friends worship together with him and are involved in his charitable activities.

We are mindful that so many people have prepared testimonials on behalf of Mr. Kofman that the Court may not be able to devote substantial time and attention to all of them. I would respectfully suggest that the Court examine most carefully the brief (just over a half-hour) video and those letters that are quoted in the following paragraphs. They are representative of the thoughts of Kofman's family, friends and the broader community. Many attest that they owe their lives to Mr. Kofman.

There is universal agreement that Kofman possesses certain character traits that make him a strong candidate for a non-jail sentence, in accordance with the sentencing factors outlined in 18 U.S.C. § 3553 (a)(1). Martin Kofman is strongly engaged with his family, his community, and in numerous charitable endeavors. Virtually all of those who write on his behalf comment on his selflessness and compassion toward others; his honesty; and his fairness.

Mr. Kofman has been married to his wife, Simy, for 34 years. She describes her husband as follows:

> Over the past 34 years that I have been blessed to be his wife, he has proven to be the most selfless, devoted husband and father a wife can ever wish for. Raising a family, providing for the physical and emotional needs for each family member, being a caring and devoted son, and attending to numerous communal responsibilities is quite a juggling act and my husband manages to do it all with a perpetual smile on his face in a calm and easy going manner.

(Ex. A).

7

In the words of his son, Shuky Kofman:

> I'm writing this as testimony that my father's deep kindness extends well beyond himself. It extends to the masses, general public, touching everyone in such a special way. His presence is an asset to the community at large.

(*Id.*).

Mr. Kofman's youngest child, Rochelle, who has struggled with drug addiction, states:

> […] on the days that I felt (& still sometimes still feel) so hopeless and have no will to live, my father is what keeps me going. His everlasting love & care for me is much of the reason I decided to turn my life around. My father did absolutely everything he could to get me better, including having to work extra hours & even borrow from family & friends to send me to the treatment centers I went to.
> He & my mother went through so much pain watching me destroy myself. Now that I am clean, we are finally are building our family & relationship together. The house feels like <u>home</u> again. My father is the pillar of our home & family.

(Ex. A).

Kofman's dedication to kids at risk has been constant and long standing. Tzivia Koff writes:

> When I was in high school I was what you would call a teen at risk. I was not a good student, did not get along with my parents and was feeling very lost when I befriended Mr. Kofman's oldest daughter, Tova. The first time that I went to her home for a "study date," I felt like I had come home. Mr. Kofman created an atmosphere in his home where everyone is made to feel welcome, everyone is served supper and he will genuinely get to know you.

(Ex. E).

Shlomo Mechlovitz writes:

> I am 24 years old and I am part of the same community as Mr. Kofman. I met Mr. Kofman at the headquarters of Ronnie's Rebels/Always Our Kids (AOK).

> […]
> AOKs relaxed, yet respectable atmosphere creates a warm environment for all of its visitors. It's an accepting and giving place, which is, no doubt, a tribute to its founders. Mr. Kofman gives his time and efforts to assist everyone he can. His accepting and pious nature has been vital to the creation and success of his wonderful support house.

(*Id.*).

And, Suri Hertz describes Martin from her perspective as the parent of a teen at risk:

> Years ago, we were parents to a struggling teen who was not in school. When we discussed the situation with Moishe, his response was immediate. I will hire him and teach him a skill, and so he did. Our son today, who is an adult, still uses the knowledge and skills taught to him by Moishe. Moishe didn't hesitate. There was a need and he generously gave of his time to help save a kid in need.

(*Id.*)

Among the many charities that have received support from Mr. Kofman is "Bike 4 Chai." Bike 4 Chai is a charity cycling event that raising funds for Chai for Chai Lifeline. Chai Lifeline takes care of children and families dealing with cancer and other serious pediatric illness. Yoel Margolese, the Director of Bike 4 Chai, writes:

> […] since Moishe joined Bike 4 Chai in 2011, he has become a good friend. In my role as Director for Bike 4 Chai, I meet many individuals yet Moishe has always stood out as special because of his care and concern for everyone around him. He is known as the guy who will do anything for anyone and always with a huge smile.

(Ex. F).

Louis Derdick, a friend of Mr. Kofman for close to 30 years, describes him as follows:

> I have seen the respect and sensitivity he has for his parents, whether it was thirty years ago when they were younger, or more recently as they have aged and become elderly. I have seen him extend this same sensitivity and caring to the elderly in our congregation, how he approaches the elderly, taking time to visit when they are sick, or just taking the time to stop, chat, inquire as to how they are feeling and more importantly, listen to their responses and offer cheerful, upbeat encouragement.

9

> I know of his involvement in helping children stricken with cancer. Each year, for the past six or so years, Martin has participated in a "Bike-A-Thon" fundraiser. Along with a special group of individuals, he rides his bike over a period of two days, covering approximately 180 miles, a fair amount of that uphill. While many would perhaps sit at home in the comfort of a chair and make some telephone calls to raise a few dollars, or just say "tell me whom to make the check out to," Martin spends considerable time for this event, as well as the two days of the event itself, so that he can inspire others to contribute to this cause. Martin participates, not because he is a muscular, athletic biker, which he is not, but rather because of his muscular athletic attitude and heart, to do all that he can to help others, even at personal sacrifice.

(Ex. H).

Aron Getter met Moshe Kofman when seeking an attorney to represent him in a real estate transaction. He speaks for many who have experienced Kofman's willingness above and beyond what is required of an attorney:

> During the years of 08 and 09 when the financial markets came crashing down, and department stores were shutting down hundreds of stores at a time, my business, too, was a victim of circumstances. There was no way for me to survive the cancellations of huge orders, and the devaluation of millions of dollars in inventory. I saw myself as a lost soul. I was going to a time of heavy depression. I wasn't able to provide the basic needs for my family. I had lots of days when I left the house without $20 in my pocket to get gas for my car. I would think many times before travel which direction to take, in order to avoid a toll booth.
>
> During those days of crisis, when my family and friends gave up on me, there was only one person who had confidence in me, and supported me during that period. Moshe spent hundreds of hours talking to me and giving me the encouragement to start all over again.

(*Id*.).

Steve Lowenthal, Moshe's partner at Lowenthal & Kofman for 25 years writes:

> Moshe is a kind man. Moshe is a caring man. Moshe is a considerate man. Moshe is a charitable man. Moshe is a compassionate man. Moshe is a devoted man. And, Moshe is inherently an honest man. I write this last sentence with full knowledge that he has pled guilty to a felony. I believe in my heart and can state with absolute certainty that the conduct that led to his plea was an aberration and totally out of character for Moshe.
>
> For the thirty plus years that know and have worked with Moshe, he has led an exemplary career as a real estate attorney, as a human being, as a member of society, and as an important figure within the Orthodox Jewish community within which we live.

(Ex. D).

Andrea Eisner, a paralegal at Lowenthal & Kofman, writes about ▮▮▮▮▮▮▮▮▮▮ her difficulties in forging a relationship with her daughter. Ms. Eisner begins her letter by describing Mr. Kofman's extraordinary efforts on behalf of his daughter, Rochelle. She continues:

> ▮▮▮▮▮▮▮▮ The major problem that I did not have enough funds to get to California. I called Martin Kofman and in spite of all of his financial hardships, he dug deep into his pockets and gave me enough money to get out to California.
>
> ▮▮▮▮▮▮▮▮▮▮. I could not have done it without Mr. Kofman's help. From what I have witnessed, Mr. Kofman has saved many young people's live and given them hope for a new life through his philanthropic work and a healing heart. I can strongly attest to this from my own personal experience and I indebted to him for helping save my life. I cannot imagine the number of people that will be helped as he continues this path of kindness. ▮▮▮▮▮▮▮▮▮▮,

11

██████████████████████████████████████
██████████████████████████████

(*Id.*).

## **CONCLUSION**

Any evidence of Kofman's guilt should be weighed against the impact of a jail sentence not only upon Kofman; but upon the members of his family, his friends, and the community at large.

Kofman's likely departure from the legal profession represents a substantial collateral consequence of his conviction.

Kofman's unblemished record over a 30 year career and the lack of any disciplinary infractions throughout his law practice are clear evidence that he is quite unlikely to reoffend.

For all the reasons stated herein, we would join in the recommendation of the Probation Department that a non-jail sentence be imposed upon this defendant. In view of the fact that Mr. Kofman has resigned from his law practice, will take some time to establish himself in a new occupation, and is presently in debt due, ███████████████████████████████████ ██████████████████████████ we would urge the Court to dispense with any fine. In considering the length of any term of probation to be imposed, the Court should consider that the defendant has already been subject to approximately three and one-half years of supervised release.

Finally, we would urge the Court to recommend to the Probation Department that in imposing any community service requirement, the defendant be permitted to apply work performed for those charities that he currently supports against any requirement to be imposed.

Dated: New York, New York
March 27, 2018

                                        Respectfully submitted,

                                        SERCARZ AND RIOPELLE, LLP

                                        By:       /S/
                                                  Maurice H. Sercarz
                                                  810 Seventh Avenue, Suite 620
                                                  New York, New York 10019
                                                  Telephone: (212) 586-4900
                                                  Email: msercarz@sercarzandriopelle.com
                                                  *Attorneys for Martin Kofman*